# 23-_____

*To Be Argued By*:
Margaret Schierberl

# United States Court of Appeals

## For the Second Circuit

❖

IN RE UNITED STATES OF AMERICA,

*Petitioner,*

PETITION FOR WRIT OF MANDAMUS TO
THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
IN CASE NO. 23-CR-13 (NRM)

## PETITION FOR THE UNITED STATES OF AMERICA

Breon Peace,
*United States Attorney,*
*Eastern District of New York*
*271-A Cadman Plaza East*
*Brooklyn, New York 11201*
*(718) 254-7000*

Amy Busa,
Tara B. McGrath,
Margaret Schierberl,
   *Assistant United States Attorneys,*
      *Of Counsel.*

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................iii

PRELIMINARY STATEMENT ............................................................. 1

RELIEF SOUGHT .................................................................................. 3

ISSUE PRESENTED .............................................................................. 3

STATEMENT OF FACTS ....................................................................... 3

I.      The Facts and Investigation ............................................... 3

II.     The Family Court Proceeding Which
        Resulted In A Finding Of Rape And Sexual
        Assault ................................................................................. 6

III.    The Federal Charges ........................................................ 10

IV.     The January 25, 2023 Bail Hearing
        Granting Release ............................................................... 10

V.      The September 13, 2023 Status Conference
        Granting Johnston's Request To Move To
        Property Of Children Including Minor
        Victim ................................................................................ 13

VI.     The Subsequent Motions ................................................. 19

ARGUMENT ........................................................................................ 21

I.      The Court Should Issue A Writ
        Commanding The District Court To Stay
        Entry Of Its Modification Of Pretrial
        Release Enabling Johnston To Move To The
        Residence Of The Minor Victim And Other
        Children ............................................................................. 22

II.    The Government Is Entitled To Mandamus
       Relief .......................................................................... 23

A.     The District Court Should Stay Its Ruling
       Until It Can Determine The Merits Of The
       Government's Motion In The Interest of
       Victim Safety ............................................................. 25

B.     Mandamus Is Appropriate Under The
       Circumstances Of This Case ...................................... 29

CONCLUSION .................................................................... 30

iii

## TABLE OF AUTHORITIES

<u>Page</u>

### CASES

<u>Cheney v. U.S. District Court</u>,
  542 U.S. 367 (2004) ................................................................24

<u>In re Roman Catholic Diocese of Albany, New York, Inc.</u>,
  745 F.3d 30 (2d Cir. 2014) .....................................................29

<u>Nken v. Holder</u>,
  556 U.S. 418 (2009) ................................................................24

### STATUTES

18 U.S.C. § 3731....................................................................22, 24

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 23-xxxx

IN RE UNITED STATES OF AMERICA,

*Petitioner*.

PETITION FOR WRIT OF MANDAMUS TO
THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
IN CASE NO. 23-CR-13 (NRM)

**PETITION FOR THE UNITED STATES OF AMERICA**

PRELIMINARY STATEMENT

This case involves a hands-on sex offender, previously found to have raped and sexually assaulted his minor stepdaughter by a New York State Family Court, imminently relocating to the very property where his victim and several other minor children reside, in a rural area of Oklahoma where electronic monitoring is unreliable. In granting the defendant Tyler Scott Johnston's bond modification request permitting as much, the district court weighed a theoretical financial burden posed by requiring Johnston to reside on a different property above the

statutorily mandated electronic monitoring and the reasonable assurance of safety of the community, namely the minor victim and other minor children who also reside on that property.

Johnston intends to relocate to the property in question following discharge from the United States Army on September 19, 2023. Although the government has moved the district court for an order precluding Johnston from living on the same property as the minor victim, that motion will not be decided on its merits in advance of September 19. Additionally, the district court has refused to stay its order.

Because the district court's order is contrary to established law and because, absent a writ of mandamus, the government has no way to vindicate the interests of the community—namely, protecting identifiable minor children, including Johnston's victim, against the acute and immediate risk posed by Johnston living in close proximity to them—the government respectfully requests issuance of a writ of mandamus.

RELIEF SOUGHT

     The government respectfully requests that this Court issue a writ of mandamus commanding the district court to stay entry of its order allowing Johnston to live on the same property as his minor victim and seven other minor children until oral argument and a ruling on the merits of the government's motion to preclude Johnston from doing so.

ISSUE PRESENTED

     Whether the district court's denial of a stay of its order permitting Johnston to reside on a remote farm that Pretrial Services cannot reliably monitor and where Johnston's minor victim also resides justifies seeking mandamus from this Court?

STATEMENT OF FACTS[1]

I.    The Facts and Investigation

     Johnston, a staff sergeant with the United States Army, vaginally and anally raped and otherwise sexually assaulted his adopted

---

[1]    The government presents this factual background section with citations, where available, to the parties' representations in the district court.  References to "Doc. #__" are references to the docket entry numbers in the district court docket in this matter, United States v. Johnston, No. 23-cr-13 (NRM).  Transcripts from the court's bail hearing on January 25, 2023, filed under seal before the district court, (Tr. I), and the status conference on September 13, 2023 (Tr. II), are attached to this

stepdaughter Jane Doe between 2019 and 2021, while she was approximately 11 to 13 years old.  The abuse largely occurred at the family residence, an apartment on the Fort Hamilton Army Base in Brooklyn, New York (the "Base"), which Johnston shared with his wife, Monica Johnston; Doe; Johnston's stepson; and Johnston's two biological children.  The abuse occurred while Johnston's wife was out of the home running errands or in another room, occupied with her younger children.  Doc. #14.[2]

Johnston employed a pattern of deceit, grooming and coercion to abuse his victim.  Beginning in 2019 when Doe was 11 years old, Johnston promised her gifts, or offered to withhold punishment for misbehavior, in exchange for sexual favors.  In the first reported instance

---

petition.  The government simultaneously moves to file under seal Tr. I, which is presently filed under seal before the district court, to protect the identity and personal identifying information of the minor victim and the government will file this document separately under seal.

[2]    The government proffered to the district court the evidence in this case in its January 23, 2023 opposition to the defendant's initial request for bail, Doc. #14, and in its January 24, 2023 letter to the district court enclosing one of the Family Court transcripts and order, Doc. #16, both of which are filed under seal.  The facts relayed in this petition are from these documents along with other documents specifically cited herein.

5

of abuse, in approximately December 2019, Johnston digitally penetrated the victim's vagina and molested her breasts.

The abuse steadily escalated.  In one subsequent instance, Johnston forced the victim to perform oral sex on him while at a vacation home in a neighboring state.  In another instance of abuse, Johnston anally penetrated her in the family living room.  In multiple instances, Johnston coerced her into vaginal sex in his bedroom, pushing her onto the bed, pinning her down by the throat or holding her by the hair as she writhed in pain.  Doe stated that at one point, Johnston showed her a peach-colored dildo, with which he threatened to rape her.

During the course of its investigation, law enforcement officers reviewed cellphone evidence pursuant to judicially authorized search warrants and consent, which revealed text messages between Johnston and Doe regarding the abuse.  Additionally, officers executed a judicially authorized search of Johnston's cellphone, which revealed searches entered into the pornographic website Pornhub.com, for pornographic content involving "stepfathers" and "stepdaughters."  In addition, the pornographic content found on Johnston's phone included results for searches such as "stepdad fucks daughter in her tight young

pussy," "daddy we should not be doing this," and "stepdad fucks daughter and her friends."  Doc. #14 at 3.

In April 2021, Doe reported the abuse, triggering a state investigation and the instant federal investigation.  Tr. I at 7:12-19. 32:20-23.

II.   <u>The Family Court Proceeding Which Resulted In A Finding Of Rape And Sexual Assault</u>

Between September 2021 and March 2022, the New York State Family Court held a trial pursuant to the state investigation, and found that Johnston raped and sexually assaulted Doe.[3]  <u>See</u> <u>In re ACS-NYC v. Tyler Johnston</u>, File No. 295195 (Family Ct. Kings County) ("Family Ct.").

During the trial proceedings, on September 23, 2021 and October 6, 2021, Doe testified under oath—testimony which the Family Court judge found to be credible.  Family Ct. Sep. 23, 2021 Tr.; Family Ct. Oct. 6, 2021 Tr.; Family Ct. Mar. 29, 2022 Tr. at 37:1-43:21.  Doe stated, in sum and substance, that Johnston would "rape" her, and

---

[3]   Per the district court's request, the transcript of the closing arguments and the judge's oral findings in the Family Court proceedings were provided to the court under seal on January 24, 2023.  Doc. #16.

specifically, "[h]e would stick his private parts in mine.  He touched me in places you are not supposed to touch and he would make me like, do stuff to his body and he would do stuff to my body."  Family Ct. Sep. 23, 2021 Tr. 49:14-50:2.  The rape occurred on a weekly basis, "[u]sually, every weekend when my mom leaves . . . . to the grocery store."  Id. at 59:8-18.  In describing one instance of sexual abuse, Doe stated, "I didn't want to do it but I had no other choice.  I didn't want to get in trouble."  Family Ct. Oct. 6, 2021 Tr. at 38:8-9.  "I would have to let him touch my body," she stated, explaining that she was forced to grant him "literally free access to my body to touch anywhere on my body."  Id. at 41:10-11.

On March 3, 2022 and March 9, 2022, Ms. Johnston, Johnston's wife and the victim's biological mother, testified under oath on behalf of the defense—testimony that the Family Court judge found to be "wholly not credible."  Family Ct. Mar. 29, 2022 Tr. at 46:23-24. Johnston's wife attempted to paint Doe as a liar and asserted that a medical professional informed her that Doe was "still intact and still a virgin."  Family Ct. Mar. 3, 2022 Tr. at 11:13-12:9, 12:18-13:1, 33:17-34:4; Family Ct. Mar. 9, 2022 Tr. at 9:17-10:3; Family Ct. Mar. 29, 2022 Tr. at 44:23-45:11 (judge rejecting Ms. Johnston's testimony about what a

doctor allegedly told her as something that "seemed odd.  It's not the kind of thing that doctors say.  It's not the kind of thing that experts in sex abuse and child abuse say.  It's elementary biology that a medical provider cannot make the determination of virginity by reference to the appearance of the child's hymen.").

On March 29, 2022, Family Court Judge Erik S. Pitchal found by a preponderance of the evidence that the defendant sexually abused Doe, including by committing rape in the first, second and third degree; criminal sex acts in the first, second and third degree; sexual abuse in the first, second and third degree; sexual misconduct; sexual conduct against a child in the second degree; forcible touching and aggravated sexual abuse in the fourth degree.  See Doc. #16-3 at 2.  In so holding, the judge rejected the defense argument that Doe was a liar, expressly stating, "This is not a child who goes around crying wolf."[4]  Family Ct.

---

[4]     In closing arguments, neither the lawyer for Johnston's stepson nor the lawyer for Johnston's two biological infants supported the finding of abuse.  See Family Ct. Mar. 29, 2022 Tr. at 19:4-8, 11-21.  The lawyer for Johnston's stepson, for example, argued that the stepson had "never seen Mr. Johnston act inappropriately" and "want[ed] his family to be reunited."  Id. at 19:5-8.  The Family Court Judge explained that the fact that Doe's siblings did not notice the abuse was "immaterial to my determination of [Doe's] credibility.  Sex abusers of children can be

9

Mar. 29, 2022 Tr. at 42:4-9.  By contrast, the judge found Johnston's wife to be "wholly not credible."  <u>Id.</u> at 46:23-24.  Among other things, the judge did not credit Ms. Johnston's statement that a medical professional informed her that Doe was a "virgin" in light of the medical impossibility of determining "virginity by reference to the appearance of the child's hymen."  <u>Id.</u> at 44:23-45:7.  The court imposed a one-year order of protection precluding Johnston from contacting Doe.  <u>Id.</u> at 54:14-16.

Thereafter, in October 2022, in connection with the federal proceeding, the United States District Court for the Eastern District of New York found that Ms. Johnston could not act in Doe's best interest in the federal proceedings and appointed a Guardian Ad Litem ("GAL") for Doe.  <u>See</u> Tr. II at 13:13-21.

---

brazen and reckless, Mr. Johnston had leverage over [Doe], and he used it.  That no one else around them noticed anything unusual is not, itself, remarkable or, frankly, unusual in intrafamilial sex abuse cases." <u>Id.</u> at 39:15-22.

III.   <u>The Federal Charges</u>

On January 9, 2023, a grand jury charged the defendant with aggravated sexual abuse of a child under 12, in violation of 18 U.S.C. § 2241(c), sexual abuse by threat or fear, in violation of 18 U.S.C. § 2242(1), aggravated sexual abuse of a child aged 12 to 16, in violation of 18 U.S.C. §§ 2241(a) & (c), and interstate coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b).  Because these charges involve sexual offenses against a minor, each count uniquely carries a rebuttable presumption of detention under 18 U.S.C. § 3142(e)(3)(E).

On January 11, 2023, Johnston was arrested, arraigned and ordered detained by the magistrate judge.  Doc. #7.

IV.   <u>The January 25, 2023 Bail Hearing Granting Release</u>

Over the government's objection, on January 25, 2023, the district court ordered Johnston released on a $1.5 million bond subject to several conditions, including a condition that he live separately from his victim stepdaughter and be subject to electronic monitoring.  Doc. #19. Five suretors signed the bond, all of whom were Johnston's family members, including Ms. Johnston and his mother, Pamela Jegstrup.  Tr. I. at 88:3-7, 93:5-7; Doc. #19.  Johnston was authorized to continue living

on the Base where his family resided, but in a barracks separate from the family apartment.

In granting release, the district court acknowledged the rebuttable presumption of detention applicable in this case.  Tr. I at 86:18-21; see 18 U.S.C. § 3142(e)(3)(E).  The court also observed that the charged conduct was "extremely serious," "egregious" and "coercive."  Tr. I at 88:8-12.

The district court nonetheless found release to be warranted based on the presumption of innocence, skepticism concerning the Family Court's findings and Johnston's apparent compliance with the no-contact order while living on the Base.  Id. at 88:20-90:17.  Notwithstanding the findings of abuse and credibility of the minor victim by the Family Court judge, the court accepted the position of the attorneys appointed for Johnston's other minor children, who disputed Doe's allegations, and sought to undercut the government's proffered evidence.  Id. at 89:17-24.  Although the government had explained that the other attorneys lacked access to all of the government's evidence and the Family Court judge had placed Johnston under supervision despite those attorneys' advocacy, id. at 43:2-6, the court found that the positions of those

attorneys "provide[] some ground to believe that 12 jurors might find . . . that the government has not met its burden of proof beyond a reasonable doubt," id. at 90:1-5.  The court further suggested that it was skeptical of the veracity of the minor victim and the Family Court's finding of her credibility in its assessment of the government's proffer.  Id. at 36:7-14 ("I have some concern based on what I read that [text messages] potentially impeach the Complainant, even if they are, in the Government's words, regarding the abuse.").[5]

The district court imposed a number of specific conditions. The court instructed that Johnston "avoid all contact with his stepdaughter . . . [and] live separately from the other members of his family."  Id. at 94:6-8.  The court ordered that Johnston "have no unsupervised contact with anyone under the age of 18 years." Id. at 95:8-11.  The court imposed an electronic monitoring condition and reasoned in particular that "the fact that he will be subject to electronic monitoring" ensured that he would remain within an "appropriate

---

[5]     In advance of the January 25, 2023 bail hearing, the district court had been provided a copy of the Family Court lawyers' closing arguments and the judge's oral findings, though not the testimony of the witnesses. Doc. #16.

boundary" supported release.  Id. at 94:14-17.  The court concurred that it would be inappropriate to impose any collaterally punitive condition that would ostracize the victim.  Id. at 101:15-18.

V.   <u>The September 13, 2023 Status Conference Granting Johnston's Request To Move To Property Of Children Including Minor Victim</u>

Following Johnston's release on bond, Ms. Johnston and her four children, including the minor victim, relocated to a remote area of Muldrow, Oklahoma to live with Ms. Jegstrup, on Ms. Jegstrup's chicken farm (the "Farm").  The Farm comprises a main house (the "House") where Doe, her siblings and four other minor children live, a chicken coop, where the minor victim works after school, and a currently vacant workhouse (the "Workhouse"), located approximately 500 to 700 feet from the House.  Tr. II at 23:22-24:9, 24:21-25:12, 31:13-32:8, 34:5-12.

At a routine status conference on September 13, 2023, Johnston requested to modify his bond to permit him to move to the Farm upon his September 19, 2023 discharge from the Army.  Id. at 23:10-24:9.  Johnston proposed three alternatives:   first, that he live in the Workhouse and work in the chicken coop; second, that he live in the Workhouse but not work in the chicken coop; and third, that he live in a

14

separate apartment in a nearby town.  Id. at 30:7-25.  In support of the modification, Johnston argued that he had been compliant with the conditions of bond to date, id. at 28:3-4; he had not attempted to contact Doe, id.; and the proximity between the Workhouse and the House was similar to the proximity between Johnston's barracks and his family's apartment on the Base, id. at 24:10-15.  Johnston acknowledged the Workhouse is located on the same property as the House where the minor victim and other minor children live, and where the minor victim is being homeschooled.  Id. at 24:2-9, 24:24-25:6, 25:13-16.   Johnston conceded that Pretrial Services "understandably is concerned about the proximity of the [minor victim]," id. at 25:19-20, as well as the inability to use GPS monitoring if Johnston were in the chicken coops due to the composition of their roofs, id. at 27:24-:26:7.  Recognizing the danger of unreliable location monitoring, the district court opined, "I think I can see a world in which if he is expected to be on the property at certain hours and the GPS signal is lost, then there would be a presumption he's in the chicken house but the officer certainly wouldn't know that for sure."  Id. at 27:3-7 (emphasis added).

Given these concerns, Johnston proposed living in a nearby town in Oklahoma or Arkansas where there are apartments for rent which did not pose the same monitoring challenges.  Id. at 30:7-25.

Both Pretrial Services and the government opposed the first two proposed living arrangements in light of obvious victim safety concerns.[6]  Id. at 31:8-32:8, 33:25-35:3.  Pretrial Services concluded, following a local officer's assessment of the property, that it could not reasonably assure the safety of the community or Doe.  Doc. #33-1. Among other things: (1) GPS signal would be lost any time the defendant was in the chicken coop, due to the composition of its roof; (2) GPS signal in the area was generally unreliable due to the remoteness of the Farm; (3) the Workhouse is only 500 to 700 feet from the House, where Doe lives; and (4) in addition to Doe, other minor children live on the property, several of whom are not Johnston's children.  Tr. II at 25:22-26:5, 31:8-32:8.

---

[6]    Neither Pretrial Services nor the government opposed in principle Johnston's third option, but could not provide consent until a specific residence and employment plan had been identified by Johnston, which, at that time, had not been identified.  Tr. II at 33:9-14, 35:4-9.

Pretrial Services explained to the district court, "not only would . . . the alleged victim in this case be living there . . . there are other minors residing very close by," only "500 to 700 feet away" from where the defendant would be residing.  Id. at 31:13-23.[7]  Pretrial Services stressed that GPS signal was unreliable in the area due to its remoteness. Id. at 31:25-32: 8.  The combination of the proximity and the unreliable GPS signal would make it "very difficult for [Pretrial Services] to pinpoint exactly where [Johnston] was."  Id. at 32:21-23.  In contrast, were Johnston to reside outside of the Farm, as proposed by Johnston himself, Pretrial Services explained "we could put a . . . GPS zone around the residential home where the family resided and have more assurance that he wasn't entering that home because of the distance." Id. at 32:15-20.

In opposing Johnston's request to live on the Farm with his victim stepdaughter, the government proffered certain undisputed facts, including that in addition to the minor victim, "[t]here are a number of other children in this house, not the biological children of this defendant,

---

[7]    There are four other children besides the minor victim and Johnston's children living on the Farm for a total of eight minor children. Doc. #33-1.

17

including female children." Id. at 34:5-7.  The victim "works in the chicken house, to earn a small bit of allowance," id. at 34:8-11, and uses a golf cart to explore the property in her free time, id. at 34:11-13.  The government explained the victim is homeschooled on the Farm, meaning "this [property] is her entire world." Id. at 34:11-12.  Accordingly, it would be "punitive to restrict her movements around her home to enable the defendant to live on [this] property." Id. at 34:13-17.  GPS signal is not only unreliable in the chicken coop but "throughout that area." Id. at 34:18-25.  The district court acknowledged the potential danger here, noting, "even if inadvertent, having Mr. Johnston in such close proximity to [the minor victim] on the same property without some sort of inherent separation that comes with the army base could be an issue for her." Id. at 35:13-17.

There is no third-party custodian present on the Farm. Indeed, as proffered to the district court, the adults living on the Farm include two suretors on Johnston's bond, Johnston's wife and Johnston's mother. Id. at 25:2-6; see Doc. #19.  The government proffered that certain suretors on the bond, all of whom are Johnston's family members, have put undue pressure on Doe to recant.  Tr. II at 19:20-20:1.

Pretrial Services and the government further distinguished between the proposed living arrangements on the Farm and those in place while Johnston was on the Base.  Among other things: (1) the Base is full of law enforcement officers; (2) Johnston's supervisors, who also resided on the Base, were aware of the allegations; (3) Johnston had no legitimate reason to visit the area of the Base in which the family apartment was located; and (4) an Army Criminal Investigation Division officer involved in the investigation resided in the same apartment complex as Doe and the family.  Id. at 32:23-33:6, 37:21-38:13.  Additionally, the government explained that Johnston, Doe and the family had been subject to oversight from the Family Court.  Id. at 38:4-5.

The district court granted Johnston's requested bond modification, allowing him to live in the Workhouse, but prohibiting him from working in the chicken coop and prohibiting him from crossing the dirt road that separated the Workhouse from the House.  Id. at 38:21-39:4, 39:15-17.  The court did not otherwise modify the bond.  In so ruling, the court stated it was "concerned about imposing an undue financial burden on Mr. Johnston's wife and his family in having to secure another

residence in town . . . ." Id. at 40:10-12. The court advised it would "see how it goes. . . . I am mindful of the potential GPS issues. But I think to allow the lack of service or occasional gaps in service in Oklahoma to keep him from his family, particularly his wife and his other children, would be unnecessarily punitive and given his compliance with all the terms of bond thus far for close to a year or at least seven, eight months, I have confidence that he'll be able to honor those limits." Id. at 39:1-11. The district court granted the government's request for a 48-hour stay of its order while the government sought guidance concerning an appeal. Id. at 39:21-24.

## VI.   The Subsequent Motions

On September 14, 2023, the government moved for a further stay of the district court's order until September 21, 2023, which motion was promptly denied. Doc. #31; Minute Entry dated Sep. 15, 2023.

On September 15, 2023, the government moved the district court for an order modifying the conditions of Johnston's bond to preclude him from living on the same property as Doe[8] and to stay the September

---

[8]   The government's submission appended a letter from the victim's GAL, Doc. # 33-2, explaining that such a move by Johnston to the same

13, 2023 order allowing him to do so until the government's motion had been decided on the merits.   Doc. #33.   The court (a) denied the government's request to stay, and (b) scheduled oral argument on the government's motion for September 27, 2023.   Minute Entry dated Sep. 15, 2023.   Notably, as discussed above, Johnston is due to be discharged from the Army and move from the Base on September 19, 2023.

---

property as the minor victim is not in the minor victim's best interests and requesting that the district court reconsider.  Doc. #33-2 at 3.  Given the minor victim is homeschooled on the Farm, the Farm is Doe's "entire world."  Id.  It is "unclear how [the victim] will avoid contact with Mr. Johnston" and the resulting harm to the victim if she does have contact. Id.  Necessarily, the victim's movements will be restricted to prevent contact with her abuser, which could cause "further distress" to the victim.  Id.  Mr. Johnston moving to the same property as the victim "will dysregulate [the victim]" which "could be dangerous for [the victim's] stability and safety."  Id.

ARGUMENT

In the face of a ruling by the New York State Family Court finding that Johnston raped and sexually abused Doe, the district court's order allows Johnston to move 500 to 700 feet away from Doe in a remote area where his movements cannot be reliably monitored. The court's approach—to simply "see how it goes"—utterly fails to adhere to statutory requirements or to appropriately weigh the acute danger Johnston poses to this victim and the community, including the other minor children living at the Farm.

Against this backdrop, the United States seeks a writ of mandamus ordering the district court to stay its ruling permitting Johnston to move to the same property as Doe until the court determines the merits of the government's motion to preclude Johnston from so doing.

I.     <u>The Court Should Issue A Writ Commanding The District Court To Stay Entry Of Its Modification Of Pretrial Release Enabling Johnston To Move To The Residence Of The Minor Victim And Other Children</u>

Absent mandamus relief, the government has no other adequate means to obtain relief from the district court's order. On both September 14, 2023 and September 15, 2023, the government moved the district court for an order staying its decision, and both motions were denied. Docs. #31, 33. The government cannot take an interlocutory appeal to challenge the court's denial of a motion to stay. <u>See</u> 18 U.S.C. § 3731.

The need for relief is immediate. The government understands that Johnston will be discharged from the Army on September 19, 2023, and required to move from the Base the same day, at which time Johnston may freely relocate to the Farm. Although the government moved the district court for an order precluding Johnston from moving to the same property as Doe, oral argument on that motion is scheduled for September 27, 2023, and accordingly such motion will not be decided in advance of Johnston's September 19 discharge. There is clear risk of substantial harm to the victim, who is certainly a party

interested in the proceeding, and irreparable harm to the government's interests in protecting victims.  As soon as Johnston is able to relocate to the Farm, his presence will risk further sexual abuse of the victim or the other minor children.  Moreover, reinserting Johnston into the victim's life, after several years' absence, and forcing her to accept that he will be living mere feet away from her, risks untold psychological harm to the victim.  These risks are heightened by the fact the location is remote and infrequently trafficked; the other adults on the Farm, Ms. Johnston and Ms. Jegstrup, are fully supportive of the defendant and, in the case of Ms. Johnston, has been found unfit to act in Doe's best interest in these proceedings; the Workhouse and the House wherein the minor victim and other minor children reside, including children who are not Johnston's, are just several hundred feet away from each other; and Pretrial Services is unable to electronically monitor the defendant's location given the unreliable GPS signal in the area.

II.    <u>The Government Is Entitled To Mandamus Relief</u>

While it is an "extraordinary remedy," a court of appeals may issue a writ of mandamus if (1) the party seeking it has "no other adequate means to attain" relief, (2) the party establishes a clear and

indisputable right to the writ, and (3) mandamus is otherwise appropriate under the circumstances.  <u>See, e.g.</u>, <u>Cheney v. U.S. District Court</u>, 542 U.S. 367, 380-81 (2004) (internal quotation marks omitted).

The first prong is easily satisfied here.  The government cannot take an interlocutory appeal to challenge the district court's denial of a motion to stay.  <u>See</u> 18 U.S.C. § 3731.

The second prong is likewise met.  The government has a "clear and indisputable" right to the relief that it is requesting:  an order commanding the district court to stay its ruling allowing Johnston to live on the same property as his sexual abuse victim, Doe, and seven other minor children, until the district court has an opportunity to determine the merits of the government's motion to preclude him from doing so. Whether a party is entitled to a stay turns on: "(1) whether the stay applicant has made a strong showing" of likely success on the merits; (2) "whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies," all of which are satisfied here.  <u>Nken v. Holder</u>, 556 U.S. 418, 426 (2009).

A.    <u>The District Court Should Stay Its Ruling Until It Can
Determine The Merits Of The Government's Motion In The
Interest of Victim Safety</u>

The government is entitled to a stay pursuant to the <u>Nken</u>

factors.  First, the district court's ruling defied clearly established law,

both because it eviscerates the mandatory bail conditions of the Adam

Walsh Act, and because it improperly weighed a theoretical financial

burden to Johnston above the grave safety concerns posed to identifiable

victims.

Under the Adam Walsh Act, in cases involving sexual offenses

against a child, the district court must impose electronic monitoring and

a condition that the defendant avoid all contact with alleged victims and

potential witnesses.  <u>See</u> 18 U.S.C. §§ 3142(c)(1)(B)(v), (xiv).  In no

uncertain terms, Pretrial Services explained to the court that there was

no meaningful way to use electronic monitoring on the Farm given the

unreliable service in the area and the close proximity between the

Workhouse where Johnston proposed living and the House where Doe

resides.  Tr. II at 31:19-33:14.  Under those circumstances, Pretrial

Services cannot appropriately monitor whether Johnston refrains from

contacting the victim.  Defense counsel did not dispute that "losing

signal" would be "an issue," but claimed that "[P]retrial [S]ervices should trust [Johnston] to do the right thing." Id. at 36:2-5. The district court likewise appeared to credit Pretrial Services' testimony and recognized that there could be a "lack of service" and "occasional gaps in services." Id. at 39:6-8. The court nonetheless subordinated those concerns to allow Johnston to more easily see "his wife and his other children." Id. at 39:6-8. In doing so, the district court improperly disregarded the statutorily mandated conditions of release.

Additionally, in granting Johnston's bond modification request, the district court weighed nebulous financial harm to Johnston above the clear danger posed to the minor victim and the seven other minor children living on the property, just several hundred feet away. In making the bond modification application, Johnston himself proposed renting a nearby apartment, demonstrating the feasibility of that option from his own perspective. There is nothing in the record concerning what that cost may be and how significantly it would burden the defendant or his family. By contrast, the danger presented by Johnston living in what amounts to the backyard of Doe and seven other minor children is plain. Johnston's alleged conduct here is egregious, amounting to weekly

instances of rape and sexual abuse of the victim, even when his wife was in another room of their home.  The weight of the evidence against Johnston is likewise strong—indeed, a Family Court judge evaluating both Doe's testimony and Ms. Johnston's testimony in support of her husband concluded that the rape and sexual abuse in fact occurred. Moreover, there are legitimate concerns that Johnston could resume the abuse once he relocates to the Farm.  As mentioned, Pretrial Services is unable to effectively monitor Johnston to determine whether he is compliant and whether Doe or the other minor children are safe.

The district court significantly overweighed Johnston's compliance to date in dismissing the danger posed by Johnston living on the Farm, given the fundamental differences between Johnston's living conditions on the Base, under which he has been compliant, and those afforded by the September 13 ruling.  Unlike the Base, where both Pretrial Services and Army supervisors could actively supervise Johnston, there are no adults on the Farm who have indicated a willingness to prevent Johnston from having contact with Doe.  Indeed, Johnston's wife and his mother, with whom Doe lives, are both supportive of Johnston, and both are suretors on his bond.  Johnston committed the

alleged sexual abuse in his family home, even when his wife was present in the home.

The remaining <u>Nken</u> factors also support the relief requested. Under the district court's order, Johnston is free to move to the Farm immediately, and he will be at liberty to do so after his discharge from the Army on September 19, 2023. The government's interest in protecting victims' safety will be irreparably harmed if Johnston is permitted to live just a few hundred feet from Doe, in a location where Pretrial Services cannot adequately ensure Doe's safety. Indisputably, the mere presence of Johnston on the Farm will cause grave trauma to Doe, as Doe's GAL has attested. <u>See</u> Doc. #33B.

By contrast, the requested stay will not substantially injure Johnston. Although the district court suggested that Johnston might suffer a financial burden by having to live outside the Farm, Johnston himself offered this possibility as an alternative condition of his release. Moreover, Johnston has been gainfully employed by the Army and there is no reason to expect he cannot obtain employment or otherwise continue to support himself as he has done for the past several years.

Finally, the public interest plainly lies in protecting the safety of victims like Doe and the other minor children residing on the property. Indeed, it cannot be in the public interest that a rapist—without effective supervision—is permitted to live in what amounts to the backyard of minor children, including the minor stepdaughter he subjected to sexual abuse over a years-long period.

B.  Mandamus Is Appropriate Under The Circumstances Of This Case

Because the government is entitled to relief, and has no way to obtain that relief absent mandamus, the writ should issue.  See In re Roman Catholic Diocese of Albany, New York, Inc., 745 F.3d 30, 37 (2d Cir. 2014) (noting that where harms can only be prevented through writ of mandamus, and where district court's orders were clearly wrong, mandamus is appropriate).  Further, the question presented here— whether the district court's refusal to stay a bond modification order that creates an acute and imminent danger to identifiable minor children, including Johnston's sexual abuse victim, for further proceedings to determine the merits of the bond modification request—is an important question meriting consideration in the face of grave and imminent danger

to children.  The court should grant the writ and maintain the status quo—allowing Doe to remain safe and protected—while the district court decides the government's motion.

CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court issue a writ of mandamus as set out above.

Dated:       Brooklyn, New York
             September 18, 2023

Respectfully submitted,

BREON PEACE,
United States Attorney,
Eastern District of New York.

By:_____/s/_____
    MARGARET SCHIERBERL
    Assistant U.S. Attorney

AMY BUSA,
TARA B. MCGRATH,
MARGARET SCHIERBERL,
Assistant United States Attorneys,
     (Of Counsel).

## FED. R. APP. P. 32(g) CERTIFICATION

This is to certify that the foregoing petition complies with the 7,800-word limitation of Federal Rule of Appellate Procedure 21(d)(1), in that the brief is calculated by the word processing program to contain approximately 5,771 words, exclusive of the Table of Contents, Table of Authorities, the Certificate of Service, and this Certification.

Dated:  Brooklyn, New York
September 18, 2023

/s/ AMY BUSA
AMY BUSA
Assistant U.S. Attorney

# EXHIBIT A

(<u>United States v. Johnston</u>, No. 23-cr-13 (NRM), Transcript of Status
Conference (E.D.N.Y. Sept. 13, 2023))

1

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2   -----------------------------x
                                       23-CR-00013(NRM)
 3   UNITED STATES OF AMERICA,
                                       United States Courthouse
 4                                     Brooklyn, New York

 5            -against-                September 13, 2023
                                       10:45 a.m.
 6   TYLER JACOBSON,

 7            Defendant.

 8   -----------------------------x

 9        TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
              BEFORE THE HONORABLE NINA R. MORRISON
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES

12   For the Government:       BREON S. PEACE, ESQ.
                               UNITED STATES ATTORNEY
13                             Eastern District of New York
                               271 Cadman Plaza East
14                             Brooklyn, New York 11201
                               BY:  MARGARET SCHIERBERL, ESQ.
15                                   TARA BRIGIT MCGRATH, ESQ.
                               Assistant United States Attorneys
16
     For the Defendant:        FEDERAL DEFENDERS OF NEW YORK
17                             One Pierrepont Plaza
                               Brooklyn, New York 11201
18                             BY:  SAMUEL I. JACOBSON, ESQ.

19
     Also Present:             TYLER JOHNSTON, PLAINTIFF
20                             OFFICER CARLSON, PRETRIAL SERVICES

21
     Court Reporter:           AVERY N. ARMSTRONG, RPR, NYRCR
22                             Phone:  718-613-2419
                               Fax:    718-613-2639
23                             Email:  Aarm.edny@gmail.com

24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

PROCEEDING                          2

1              (In open court.)

2              THE COURTROOM DEPUTY:  Criminal cause for a status

3    conference for case number 23-CR-13, USA *v.* Tyler Johnston.

4              Counsel, please state your appearance for the

5    record, starting with the Government.

6              MS. SCHIERBERL:  Good morning, Your Honor.

7              You have Margaret Schierberl for the United States.

8    I'm joined today by AUSA, Tara McGrath, and supervisory

9    pretrial services officer, Amanda Carlson.

10             Good morning, Your Honor.

11             THE COURT:  Good morning.

12             MR. JACOBSON:  And good morning, Your Honor.

13             Sam Jacobson, Federal Defenders, for Tyler Johnston,

14   who's present next to me.

15             THE COURT:  All right.  Good morning.  Good morning,

16   Mr. Johnston.  Have a seat everyone.

17             All right.  So we are here for a status conference

18   in this matter.  I know we adjourned it a few times while the

19   parties were conducting discovery and in discussions with one

20   another.  So let me hear a report starting with the

21   Government.

22             MS. SCHIERBERL:  Thanks, Judge.  We've a couple of

23   items on the agenda today.  I'll start with discovery.  We

24   continue to make productions of Rule 16 discovery and we

25   continue to engage in discussions about discovery with defense

PROCEEDING                          3

1    counsel.  We received late last night a written request from

2    defense for additional discovery which we'll respond to and we

3    expect those discussions to continue smoothly as they have

4    thus far.

5            With respect to plea negotiations, Your Honor, while

6    those have been ongoing and both sides have made attempts to

7    see if we can reach a resolution, short of trial.  At present,

8    we don't believe such a resolution is likely.  Certainly, I

9    won't foreclose that possibility and will continue to engage

10   in negotiations, but we do believe, at this point, it would

11   make sense to set a trial date, and then work backwards to the

12   extent that there's any motion practice to keep this case

13   moving forward.

14           THE COURT:  Okay.

15           MS. SCHIERBERL:  I would propose, Your Honor, a fall

16   trial date if the Court's calendar permits.  We had a brief

17   discussion with chambers --

18           THE COURT:  Fall, meaning, this fall?

19           MS. SCHIERBERL:  I do, Your Honor, fall of 2023.  If

20   that's unavailable, then it sounded perhaps like early

21   December might be available to the Court.

22           THE COURT:  Okay.  I think this fall might be a

23   little difficult, but let's hear from both sides about the

24   status of where we are, especially if we may have motion

25   practice before then.

PROCEEDING                                    4

1          MR. JACOBSON:  I agree, Your Honor, with the

2    Government's representations regarding the status of plea

3    negotiations.  There have been discussions between the

4    parties.  We don't anticipate a plea at this time, but we

5    would, of course, notify the Court if that changes.

6          As to a trial date, fall 2023 is really not feasible

7    on our end.  When the Government had suggested a fall date, I

8    had assumed they meant fall 2024.  This is a new case.  It's a

9    23-CR-indictment.  The conduct in the allegations is all from

10   2019.  The Government waited three years to charge the case.

11   I don't think there's a huge rush and certainly not a rush

12   that trumps Mr. Johnston's right to prepare a defense.  There

13   is a lot of investigation that we still have to do.

14         I think we are, as the Government noted, potentially

15   inching towards a discovery dispute that we'll ask the Court

16   to resolve.  At least from my perspective, there's other

17   potential *Brady* material and Rule 16 that hasn't yet been

18   disclosed to the defense.

19         As an example, I would note that in the Family Court

20   proceedings in this case, Mr. Johnston's lawyer received much

21   more discovery than we have received in connection with the

22   criminal case.  I can't even say what those materials are

23   because they're under a protective order in Family Court and

24   his Family Court lawyer can't give me those materials.

25         THE COURT:  Mr. Johnston's Family Court lawyer can't

PROCEEDING                                5

1    give you those materials because they're still under

2    protective order?

3              MR. JACOBSON:  Yes.  But having spoken with her

4    there are materials that she has that we don't have in the

5    criminal case.

6              THE COURT:  And does the Government have a full copy

7    of the Family Court production that was produced at the time?

8              MS. SCHIERBERL:  No, Your Honor.  The Government's

9    working with the Family Court agencies to obtain materials to

10   the extent they fall under Rule 16, the Government is

11   producing them.  As I noted, just late last night we received

12   a written request from defense to which we said we would

13   respond, and we will.  To the extent those materials are

14   Rule 16, we will continue to expeditiously produce them.

15             Of course, if the Government becomes aware of any

16   *Brady*, it's aware of its obligations and it will produce that

17   material to the defense.  The Government is not, at present,

18   aware of any *Brady* material that exists, certainly that exists

19   outside the productions that were made, but in general.

20             And I would just note, in response to counsel's

21   statements that this case was indicted on January 9th, we're

22   now in September.  The conduct alleged in the indictment does

23   commence in 2019 when the victim was 11, but extended for

24   years through April of 2021, and we are aware that the Federal

25   Defenders were present, at least in part, for the Family Court

1   proceedings.  So while this is a new case in a sense, it is

2   not a new case in another sense, and we believe it's the

3   defendant's right to a speedy trial, and it's in the interest

4   of all parties, including the defendant and the witnesses, in

5   this case, to move forward, expediently.  So that's why we'd

6   propose, if not a fall trial date, then an early winter trial

7   date for this year.

8            THE COURT:  Okay.  Let me just ask to you follow up

9   a little on the question about the Family Court file.

10           This is the first case I've had since I got here

11  that involved a parallel Family Court proceedings, and I know

12  there are very different confidentiality rules.

13           How is it that you're able to do your *Brady* review,

14  putting aside Rule 16, any of your *Brady* review of whatever

15  prior statements, the complainant, others in the case,

16  anything related that may fall under *Brady*, if you haven't

17  even gotten access to the full Family Court record at this

18  point?

19           MS. SCHIERBERL:  Thanks, Your Honor.  I just wanted

20  a moment to confer with counsel.

21           We do believe, at present, we have the bulk of those

22  materials.  They have been reviewed, and to the extent the

23  Rule 16 produced, of course, the Family Court is a separate

24  entity.  Based on defense counsel's representations that there

25  are additional materials, we are working with the Family Court

PROCEEDING                               7

1   entities to obtain those materials and review and produce

2   them, once, of course, they fall within the, you know, custody

3   and control of the Government, then we will review and produce

4   them.  But we do believe, at present, we have the bulk of

5   those materials and have produced them.

6           THE COURT:  Okay.  There is a difference between the

7   bulk and all of them, but I know you're working under some

8   constraints here.  So you should feel free to let me know if

9   you need an order for me that would be helpful to expedite

10  things in any confidentiality issues on the Family Court's end

11  with ACS.  You know, to the extent they are being slow to

12  produce them to you and it's holding things up, if I can be

13  helpful in any way and there's any terms or conditions they

14  need, let me know.

15          MS. SCHIERBERL:  Thank you, Judge.

16          THE COURT:  And I know there have been some talk, if

17  I recall correctly, way back at the time of the bond hearing

18  about some forensic evidence.

19          Has that testing all been complete and have the

20  results been turned over as part of Rule 16 discovery?

21          Do you know?  I think there was some DNA evidence

22  and some others.  I'm just thinking about, prior to trial,

23  there may be some issues with experts both in terms of the

24  defense's own analysis, and I like to do all of the *Daubert*

25  issues around experts well in advance of trial because it can

PROCEEDING                                    8

1    affect people's trial position, as well.

2              MS. SCHIERBERL:  We appreciate that, Judge, and at

3    present, the DNA testing is complete, and the reports of the

4    results of that testing have been produced to the defense.

5              THE COURT:  Okay.  And what's the general practice?

6    Do the labs that you work with or do you produce all of the

7    underlying records, all the bench notes, all the raw data, or

8    is that something the defense typically has to get by request

9    or otherwise?

10             MS. SCHIERBERL:  Good question, Judge.  This testing

11   in this case was done by the United States Army, not our usual

12   OCME.  To the extent there are underlying notes, we will

13   obtain them and produce them.  The defense doesn't need to go

14   out of its way to make any sort of formal request.

15             THE COURT:  Okay.  Yeah, I think, whatever -- I

16   mean, typically, there is a full official file that usually

17   has the raw data, the notes, any communications corresponds to

18   anything of that type.  So, you know, the sooner we're able to

19   get that produced -- and the defense might say we don't have

20   an issue with these results, our theory of the case is

21   different, or they might say we need an expert, but it's

22   usually good to know because those experts can take some time

23   to do their review.  So I want to make sure that's underway as

24   well.  Okay.

25             What about motion practice?  I know we haven't

PROCEEDING                                9

1   completed discovery yet, but at this juncture, what does each

2   side anticipate in terms of motion practice, if you're able to

3   tell me?

4          MS. SCHIERBERL:  Your Honor, we do expect, based on

5   representations from defense that defense envisions motion

6   practice, but the Government doesn't have any motions that it

7   intends to bring at this time.

8          THE COURT:  Okay.  Recognizing you haven't gotten

9   all of your discovery yet, tell me, at this juncture, what

10  you're anticipating, even in terms of volume and complexity of

11  motions, if you can speak in general terms.

12         MR. JACOBSON:  I think, certainly, motions in limine

13  that will be up to trial, Judge, but, also likely, Rule 12

14  motions, a motion to suppress, a motion to compel discovery

15  that we haven't received, potentially other Rule 12 motions.

16  I might have a better sense of exactly what we'd be filing at

17  the next conference, and we could set a motion schedule at

18  that time.

19         THE COURT:  Sure.  So let's do this, I appreciate

20  the need and the intent of the parties in getting ahead of

21  this and getting some dates on the calendar.  But I have a

22  very busy October, November, and December tends to be a

23  truncated month.  So I think in -- more fundamentally, in

24  light of the potential motion practice and the fact that

25  discovery isn't yet complete, in part, due to the fact that

PROCEEDING                              10

1   the Government still doesn't have the full record of the

2   Family Court proceeding, I'm not going to set a trial date at

3   this time.

4           I think I do have some time in December and January,

5   potentially, if we're going to have any hearings, that might

6   take two or three days.  I could certainly make some time to

7   hear any testimony on any motions if we have motions that are

8   ripe and fully submitted at that point.  February is also

9   possible, but I think we need to take this one step at a time,

10  at this juncture.

11          MS. SCHIERBERL:  Your Honor, on offer we did discuss

12  with chambers a date for the next status of October 16th at

13  11:30.

14          THE COURT:  Sure.  I may not need to see that soon

15  if we're not setting a date yet.  I'm happy to see you if

16  you'd like to.  I know that does require Mr. Johnson to come

17  in, so we can do it about by video.  I could also see you in

18  November if you prefer.

19          What do the parties want to do?

20          MR. JACOBSON:  I would prefer November.  I just

21  don't think we'll have much to report in an early or

22  mid-October date.

23          THE COURT:  Okay.  If you do end up having a

24  discovery dispute and that you need me to resolve, you can do

25  that by letter, and then I may want to get you on the video or

1  have you come in to argue it or just ask you some questions

2  about it.  So we may see each other before then, regardless,

3  but I think November is fine by me.

4            Let me just look real quick at my calendar.

5            Sorry, things are freezing on my end.  Let's just go

6  off the record for one second.

7            (Whereupon, an off-the-record discussion was held at

8  this time.)

9            THE COURT:  How is Wednesday, November 15th at

10  11:00, or I could do Thursday or Friday of that week as well

11  if that's no good for everyone?

12            MS. SCHIERBERL:  November 15th is fine with the

13  Government, Your Honor.

14            THE COURT:  Okay.

15            MR. JACOBSON:  Same on our end.

16            THE COURT:  So let's do Wednesday, November 15th at

17  11:00, in person, and if you have anything you need to raise

18  with me before then regarding protective orders, discovery

19  issues, you're welcome to raise it in writing or if you want

20  to do a brief phone conference we can schedule one of those.

21  All right?

22            MR. JACOBSON:  There are a few other issues that I

23  wanted to raise.  I first wanted to flag a few of the

24  discovery disputes that I think are on the horizon because

25  maybe we can even address and deal with them today.

PROCEEDING                                    12

1          The first is that I believe that there was a

2     guardian ad litem appointed, in this case, for the

3     complainant.  I don't believe that application was made before

4     Your Honor, but the Government, I think requested a guardian.

5     I don't have any paperwork or documentation of that, and I

6     think one problem I'll have in this case is that I don't know

7     which witnesses are represented and which aren't because it

8     does seem that the Government has made applications for some

9     of the potential witnesses to have counsel.  And so it's

10    impeding our investigation because we don't know the scope of

11    the representation of those witnesses or whether they are, in

12    fact, represented to begin with.

13         I have requested from the Government, any

14    applications they made regarding appointment of counsel, and I

15    haven't received that yet.  Especially in the guardian ad

16    litem context, it can be -- the rules on whether that person

17    counts as a represented party are complicated, so I would need

18    to understand a little bit more about the scope of that

19    representation.  And so that's one request that I've made that

20    I haven't yet received.

21         THE COURT:  And just so I understand the context in

22    terms of your overall trial preparation, this is so you that

23    you don't inadvertently have an investigator or you contact

24    someone who may be a fact witness in the case, and it turns

25    out that person is represented.

PROCEEDING                    13

1         MR. JACOBSON:  That's right.  So we have held off on

2    some aspects of the investigation that involve talking to

3    potential Government witnesses so we're sure of who's

4    represented and in what capacity.

5         THE COURT:  Okay.  Ms. Schierberl, anything you want

6    to address on that point?

7         MS. SCHIERBERL:  I'm actually very glad defense

8    brought that up.  I'm somewhat confused by defense's

9    representation that he's unsure whether or not a guardian was

10   appointed.  I spoke to the guardian last night who told me

11   that she was contacted by defense counsel in this case.  I had

12   presumed that that was Mr. Jacobson, perhaps it was not.

13        There was a guardian appointed in this case before

14   then, Chief Magistrate Judge Pollak.  Of course, we will

15   respond to defense counsel's request in writing as we

16   expressed to defense.

17        But I would like to make a clear record that the

18   child, in this case, is in fact, represented in the sense by

19   the guardian ad litem.  The guardian ad litem was appointed by

20   the Court during the pendency of this case to make decisions

21   in the best interest of the child, and the guardian did

22   clearly communicate to me that she clearly communicated to

23   defense that the child would not be interviewed by defense

24   counsel.

25        So if there is any confusion, I think it would be

PROCEEDING                                        14

1    inappropriate for defense to seek, for example, to interview

2    the child by requesting permission of the child's biological

3    mother, when, in fact, the guardian has been appointed, and it

4    seems like defense has no problem being in touch with her.

5           THE COURT:  Right.  I know we've had one counsel

6    who's on maternity leave so there could have been an issue of

7    who it was and whether that was communicated.  But I don't

8    know who it was.

9           MR. JACOBSON:  It was me that spoke to the lawyer

10   that I now understand to be the guardian ad litem.  But it

11   took an investigation on our end just to determine that there

12   was a guardian, who it was, how to contact that guardian, and

13   because I still don't have a clear sense of the scope of that

14   guardianship, I don't know if under the New York rules -- I

15   reached out to her in an abundance of caution, but I don't

16   know, because there are different types of guardians in

17   different contexts, and they can be appointed for various

18   reasons, I don't know that that counts as representation in

19   terms of the witness rules.

20          THE COURT:  Okay.  So it sounds like as of now, that

21   communication that you got from the guardian ad litem was

22   that, her client, or his client, declined to be interviewed at

23   that time you contacted them.  I don't know when that was; is

24   that correct?

25          MR. JACOBSON:  It was yesterday.  And the guardian

1   did not say that the witness declined.  The guardian declined

2   on the witness' behalf.  I don't know whether the witness

3   would be interested in speaking with us.  I understand that in

4   general, a guardian is supposed to look out for the best

5   interest of the child.  I don't know if there were other

6   reasons that the guardian was appointed.

7           Obviously, Mr. Johnston has no contact with the

8   complainant.  But you know, I don't know because the guardian

9   clearly allows the Government to speak with her client, but

10  has categorically said that defense cannot.

11          THE COURT:  Okay.  Sounds like probably the first

12  thing to do is for you to research the question on your end

13  about whether you think the rules apply as they would with an

14  adult who was represented, who would retain counsel, or some

15  other format.  If you think that there is some ambiguity and

16  the two of you are unable to work out this question of can you

17  have contact or you aren't able to get the information that

18  you need from the guardian ad litem as to whether they've

19  conveyed your request to their client and get information back

20  to you, then you can come to me.

21          I would think out of an abundance of caution, given

22  the uncertainty in this area, the wiser course is not to try

23  to contact the complainant directly at this point.

24          MR. JACOBSON:  Of course.

25          THE COURT:  And with those ambiguities there, I'll

PROCEEDING                              16

1  let you sort it out.  But I appreciate everyone raising it

2  with me since I wasn't the Court who appointed that guardian.

3  I didn't even know there was one.

4           MR. JACOBSON:  But the results of my research are

5  that it really depends on what statute the guardian is

6  appointed pursuant to.  So -- which is why it would be helpful

7  for me to have the application.

8           THE COURT:  Okay.  Any objection to giving the

9  defense the application, even with redactions, just to show

10  the legal vehicle that was used just so they can do their due

11  diligence?

12          MS. SCHIERBERL:  Judge, we have no objection to

13  providing to defense the order by which the guardian was

14  appointed.  We can also speak with defense counsel if he's

15  having any trouble getting in touch with the guardian and

16  provide contact information.  Like I said, and it sounds like

17  counsel agrees, they recently spoke, so clearly he's able to

18  communicate with her without issue.  But we can provide that

19  order to defense.

20          THE COURT:  Thank you.

21          MS. SCHIERBERL:  Of course.

22          THE COURT:  All right.  What else?

23          MR. JACOBSON:  This -- and I think the larger issue

24  we'll be dealing with is that this is a case where the

25  Government's case in chief is going to rest largely on the

1    testimony of one witness, which makes it especially important

2    for -- and this is a witness who does have a significant

3    mental health history.

4              And so -- and we do know that there is *Brady*

5    material in some of this witness' records.  We've found what

6    we consider to be *Brady* in our own investigation, so I would

7    just ask that if the Government has any document that is

8    potentially useful to the Government -- to the defense, even

9    if they wouldn't ordinarily view it as Rule 16, they have to

10   turn it over.

11             There's a similar problem with both the Family Court

12   record and the Army Criminal Investigation Division record

13   because they were either investigations on the CID end or

14   proceedings in the Family Court.  I think some of the

15   materials in those files, the Government is going to argue is

16   3500 material and not discoverable at this time.

17             THE COURT:  Mm-hmm.  Right.

18             MR. JACOBSON:  But those are materials that in the

19   Family Court context, Mr. Johnston has already seen and

20   reviewed with his Family Court counsel.  So it's a hindrance

21   for his now criminal court counsel to not have access or not

22   even be able to discuss those protected materials with him.

23   And in a case where it's really one witness, I think not

24   turning over extensive prior statements and documentation from

25   this witness until a week before trial, it's going to be

PROCEEDING                                18

1   really problematic for Mr. Johnston's defense.

2                MS. SCHIERBERL:  May I briefly respond, Your Honor?

3                THE COURT:  Sure.

4                MS. SCHIERBERL:  If the Court agrees, I would

5   propose that the parties work through each of these unique

6   discovery issues.  I think I mentioned defense counsel sent a

7   letter to the Government around 10:30 last night setting forth

8   each of these requests, and the Government indicated earlier

9   this morning that it would respond.

10               It may be more expeditious or more efficient for us

11  to respond and sort out these issues with defense, and then to

12  the extent necessary, raise with the Court, any particular

13  discovery issues if and when that arises.

14               THE COURT:  Okay.  That seems to make sense.  So I'm

15  glad you flagged this one for me, obviously, with, you know,

16  when there's an issue of a complainant who's been interviewed

17  multiple times, there's often room for interpretation about

18  whether prior statements count as 3500 material or it might be

19  construed as *Brady*.

20               As you know, I always urge Government to err on the

21  side of disclosure.  I would really hate to be in the position

22  where if we have a trial date coming up in the next few weeks

23  or within the next year and everybody's ready, and then we

24  find out that there was a 3500 disclosure that should have

25  come much earlier for *Brady*, when we have to put off the

PROCEEDING                                    19

1    trial.  That's in nobody's interest.

2           So either to the extent you're able to turn those

3    over, sooner, as Brady, or you can say we don't think these

4    are Brady, but we're going to give them to you out of an

5    abundance of caution, or you agree, in this particular case,

6    as I know you have in some complex cases, to give the 3500

7    material earlier than usually is the Government's practice.

8    And I appreciate that your office does them sooner than

9    required by statute in most cases.

10          I think that would be helpful so that we don't have

11   any confusion.  But I do agree with you, let's not anticipate

12   a problem, but I'll be able to work it out.  So I'll leave you

13   all to resolve the discovery issues that were raised last

14   night, and again, if something comes up in the meantime and

15   you think you need my attention on it and it would be

16   efficient to come back in, you're welcome to.  I can make some

17   time for you before our next status, if need be.

18          MS. SCHIERBERL:  Thank you, Judge.  The Government

19   just had one last issue on its agenda.

20          We're particularly concerned with behavior that has

21   come to light that we wanted to bring to the Court's attention

22   from multiple sources.  We're aware that certain of the

23   suretors on this defendant's bond are exerting inappropriate

24   influence over the victim in this case, behaviors that

25   potentially amount to witness tampering or obstruction of

PROCEEDING                           20

1   justice.

2          Now, we had prepared to come to Court with certain

3   avenues to remediate that behavior short of removing those

4   suretors from the bond, which could result in remand of the

5   defendant.  And I understand from discussion with our case

6   agent this morning that a letter was sent to the paternal

7   grandmother of the defendant requesting that this behavior

8   cease.  Now, the Government wasn't provided a copy of that

9   letter.

10          THE COURT:  A letter was sent by?

11          MS. SCHIERBERL:  I presume it was sent by the

12   defense.  It was not sent by the Government.  The

13   representation made to the Government was that it was a notice

14   from counsel requesting that any attempts to influence or

15   change the testimony of the child should cease.

16          Of course, we agree, and first and foremost, we'd

17   like the behavior to stop.  If it is, in fact, the case, and

18   perhaps defense can shed some light on this, that defense sent

19   a letter, and believes that that will change the behavior, we

20   can monitor the situation before we ask for the Court's

21   intervention.

22          But we wanted to make a clear record that such

23   behavior would be inappropriate on the part of any person, but

24   in particular, on the part of a surety who has signed a bond

25   to keep this defendant at liberty, pretrial, should not be

PROCEEDING                              21

1   exerting inappropriate influence over any person, especially a

2   minor victim, and witness, in this case.

3          THE COURT:  Mr. Jacobson.

4          MR. JACOBSON:  This is the first I've heard of a

5   letter.  I didn't send the letter.  Maybe it was -- there are

6   other counsel in this case that I potentially don't know

7   about.  I would not have sent Mr. Johnston's mother a letter,

8   and I don't know how the case agent would have found out about

9   this from Mr. Johnston's mother on the morning of Court.

10          And I don't know what the letter says.  I really

11   can't respond to that.  I also don't know enough about what

12   the Government is saying happened in terms of undue influence

13   to be able to respond.

14          I absolutely agree with the Government that no one

15   should be pressuring or trying to influence any witness.  I

16   can't imagine having spoken many times to Mr. Johnston's

17   family that they would do that.  I would need to hear more

18   about the facts of what happened.

19          MS. SCHIERBERL:  Judge, the defendant's paternal

20   grandmother contacted the FBI and made them aware of a letter

21   that was described as a notice from counsel to cease any

22   attempts to influence or change the behavior of the victim's

23   testimony.  As I noted we're aware from multiple sources that

24   for an extended period of time, certain suretors on the bond

25   have exerted inappropriate influence, made inappropriate

PROCEEDING                          22

1    comments to the victim regarding the allegations in this case.

2    It's in everyone's interest, I would submit, for this behavior

3    to stop.

4              Now, I don't know who sent this letter.  It did not

5    come from the Government.  As I noted, I have a couple of

6    options that we were intending to submit for the Court's

7    consideration to address the behavior.  If the letter didn't

8    come from defense counsel, I'm not sure who sent the letter to

9    the paternal grandmother.

10             THE COURT:  Go ahead.

11             MS. SCHIERBERL:  We seek the Court's guidance, I

12   think, at this point.

13             THE COURT:  Yeah, I mean -- I think everyone is in

14   agreement that it would be inappropriate for any person in the

15   family, outside the family to attempt to influence the

16   complainant as to any aspect of her potential testimony as to

17   how she wishes to proceed with the case in any way whether

18   it's a suretor or any other person.  It doesn't sound like

19   even between the two of you, both sharing that view, there's

20   specific information before me other than some concerns that

21   this may be happening from one or more sources who maybe

22   sureties or who may not be that I can address at this point.

23             So I think the Government's plan to monitor the

24   situation and let me know if -- if something comes up seems

25   like a good one.  And I certainly accept Mr. Jacobson'

PROCEEDING                                    23

1    representation that he didn't send the letter, that it

2    wouldn't be his practice to send that kind of letter.  You

3    know, so I think we'll just have to wait and see if the FBI

4    gets anymore information to the extent anyone pursues it.  And

5    perhaps raising it here will be enough for that to cease.

6              MS. SCHIERBERL:  With that, Your Honor, we have

7    nothing further.

8              THE COURT:  Okay.  Anything further from the

9    defense?

10             MR. JACOBSON:  One other thing, Judge.  And if the

11   Court is wondering why pretrial services is here, we do have

12   an issue coming up in terms of where Mr. Johnston will reside

13   that we wanted to discuss with the Court.

14             THE COURT:  Sure.

15             MR. JACOBSON:  After 11 years, Mr. Johnston is being

16   discharged from the U.S. Army on September 19th, and has to

17   move out of the barracks, at that time, which is coming up.

18             I've had discussions with pretrial about a plan for

19   next steps with him.  I think there are disagreements on some

20   aspects of our proposal.  So I wanted to hear the Government's

21   thoughts and just flag for the Court what we are proposing.

22             Mr. Johnston's family lives in Oklahoma.  They have

23   a -- it's a working farm.  And there is a workhouse on the

24   other side of the road that's part of the property that's

25   vacant, and so the family's proposing that Mr. Johnston live

PROCEEDING                          24

1   in the workhouse and work on the chicken farm on the property.

2   I understand pretrial's concerns on this.  The complainant

3   lives in the family house on the property --

4              THE COURT:  In Oklahoma?

5              MR. JACOBSON:  In Oklahoma, yeah.  Same property.

6   It's a large property with multiple houses.  The house that

7   we're proposing Mr. Johnston would live in is on the other

8   side of the road from the house the complainant lives in with

9   the rest of the family.

10             It wouldn't be different from the circumstances

11  until the complainant and family moved out to Oklahoma where

12  the complainant and family were living in the on-base housing

13  at Fort Hamilton and Mr. Johnston was living in the barracks,

14  I think, just a couple of hundred meters away.  So the

15  distance would be the same --

16             THE COURT:  So let me see if I understand this

17  correctly.

18             Currently, Mr. Johnston is still living on base, but

19  that's going to end on the 19th of September --

20             MR. JACOBSON:  Yes.

21             THE COURT:  -- in just a few short days.  And then,

22  at some point in the recent past, I'm not sure when, the

23  complainant and some members of her family moved out to the

24  grandparent's house in Oklahoma themselves and -- are all the

25  children there, Mr. Johnston's other children, as well?

PROCEEDING                                25

1          MR. JACOBSON:  Yes.  They're all there.

2          THE COURT:  And his wife is there, as well?

3          MR. JACOBSON:  She is.

4          THE COURT:  Okay.

5          MR. JACOBSON:  And the grandparents and the

6     grandparents' other children.  It's a large house.  But

7     there's a separate building across the road still on the

8     property where workers on the farm would typically live, but

9     it's currently vacant.  The family, Mr. Johnston's wife and

10    children had moved out to Oklahoma in advance of his discharge

11    from the army but he just had to wrap up some final

12    administrative matters.

13         THE COURT:  All right.  And so the children are in

14    school there, I take it, as well.

15         MR. JACOBSON:  They are, except for the complainant,

16    who I understand is being homeschooled, which, of course,

17    might pose an issue for Mr. Johnston to work in the chicken

18    house which is closer to the main residence than the workhouse

19    which is on the other side of the road.  So I think pretrial

20    understandably is concerned about the proximity of the CW.  I

21    think their other concern --

22         And I had raised this proposal a month or so ago

23    with pretrial -- and they sent an officer from the Oklahoma

24    pretrial office out to the residence to do an inspection.  I

25    think the other concern that the Oklahoma officer had was

PROCEEDING                                        26

1   regarding the GP -- if Mr. Johnston is working in the chicken

2   house that has a tin roof, and apparently a tin roof is the

3   one thing that can really hinder a GPS signal.  So they would

4   lose him while he was in the chicken house and regain the

5   signal when he left the house.  So those were the -- and I

6   spoke to the Oklahoma officer as well and those were the, kind

7   of, main concerns that he had conveyed to me.

8           THE COURT:  Okay.  Are there any potential

9   modifications to the tin-roof problem?  This is where I'm

10  going to put on the record the Court's lack of knowledge about

11  chicken houses and how they are typically roofed and protected

12  from the elements.  But I don't know if the family has a

13  thought about a workaround, some other material that might

14  allow the GPS to keep working if he's there.

15          MR. JACOBSON:  The chicken house is very large.

16  It's hundreds of meters long.  It's an industrial operation.

17  You know, it's not a small family farm.  They sell the

18  chickens.  So replacing the roof is not feasible.  I had

19  discussed with the Oklahoma officer, the possibility of

20  setting Mr. Johnston's curfew so that he could only start

21  working in the chicken house after the complainant leaves for

22  school in the morning and vice versa in the afternoon.  But

23  the fact that we now know that they're being homeschooled, I

24  think foils that plan.  But I still think that there are ways

25  to enforce separation between Mr. Johnston and the

PROCEEDING                               27

1    complainant.

2            THE COURT:  What are your thoughts on the GPS

3    situation given that the roof isn't replaceable?  I mean, I

4    think I can see a world in which if he is expected to be on

5    the property at certain hours and the GPS signal is lost, then

6    there would be a presumption he's in the chicken house but the

7    officer certainly wouldn't know that for sure.

8            So I don't know enough to know if that would -- if

9    he had by some chance left the property or was somewhere he

10   wasn't supposed to be, there would be a loss signal or a

11   tracking that would indicate that he had actually left the

12   property.  So if he hadn't had any movement, they would know

13   that he hadn't gone anywhere and the lost signal would be due

14   to that if there was some way to check in.  I just don't know,

15   but I would want to hear some proposal for a workaround or

16   some response from you as to why it's not an issue.

17           MR. JACOBSON:  So that's my understanding.  But

18   Officer Carlson might have a better sense of the technical

19   aspects of the monitoring unit.  I believe, according to the

20   Oklahoma officer, when they lose the signal in the chicken

21   house, they will know that that is where Mr. Johnston is

22   because when he leaves the chicken house, they will almost

23   immediately pick up the signal again and see that he's left.

24           So no signal means that he's working in the chicken

25   building.  I think given the rural location, the officer

PROCEEDING                                28

1    thought that there might be periods where it might not

2    immediately kick in again, it might take some time to regain

3    the signal.  But, you know, I think Mr. Johnston has been

4    doing fine on bail and he has not had any contact with the CW.

5    I think he understands the repercussions of attempting to make

6    any contact with her whatsoever, so I don't see it as a

7    concern.

8              THE COURT:  What are his other options for residence

9    if I were not to allow him to go to Oklahoma?

10             MR. JACOBSON:  Well, the back-up plan to working in

11   the chicken house is he would just live in the workhouse

12   across the road which has even more separation from the

13   residence where the complainant resides.  The complainant

14   would have no reason to cross the road and go to the area

15   where the workhouse is.  And if Mr. Johnston is not working in

16   the chicken area, he would have no reason to come across the

17   road to the area where the family residence is located.

18             So I think if the Court is not comfortable with him

19   working on the farm, I think residing on the farm is still

20   fine because pretrial would know that if he -- that that sort

21   of road is a hard line and he can't cross it and come on to

22   the main part of the family property.  So I think in a way

23   that provides even more assurances than the situation at Fort

24   Hamilton where the barracks and the on-base housing was almost

25   co-located and anyone could walk down the street and walk into

PROCEEDING                              29

1   each other or try to initiate contact.

2              THE COURT:  And how would he -- if he wasn't to go

3   into the chicken house area where he'd lose GPS, how would he

4   have contact with his other children, with the family, and his

5   parents, other than the complainant?

6              Tell me a little about the proposal in terms of that

7   structure.

8              MR. JACOBSON:  They would come to him.

9              THE COURT:  Okay.

10             MR. JACOBSON:  To the workhouse.

11             THE COURT:  What's the setup of the workhouse, is it

12  an actual residence, because it's a house where workers live?

13             THE DEFENDANT:  It's a three bedroom.

14             MR. JACOBSON:  It's a three-bedroom house.  So there

15  are no workers living there currently.

16             THE DEFENDANT:  No.

17             MR. JACOBSON:  I think Mr. Johnston's family right

18  now is -- are the primary operators on the farm.

19             I have a satellite printout of the property if the

20  Court wants to see it and you can see the road and where the

21  houses are located.  It's not a great printout, but I'm happy

22  to provide it.

23             THE COURT:  Sure.  I think that would be helpful.

24  And is the reason why -- and I apologize if you said this

25  earlier, your first proposal is for him to live or at least

1    work in the chicken house so that he could contribute to the

2    farm while he's there?

3              MR. JACOBSON:  That's right.

4              THE COURT:  And so tell me again, proposal number

5    one, proposal number two, what's the difference between the

6    two?

7              MR. JACOBSON:  There is a proposal number three in

8    case the Court is not comfortable with the workhouse plan

9    either.  Proposal one is that he live in the workhouse and

10   work in the chicken house.  Proposal two is that he just live

11   in the workhouse, not be permitted to work on the farm because

12   the complainant is currently homeschooled, and have that sort

13   of hard line of the road that he can't cross so that he's not

14   anywhere near the main residence.  That's plan B.

15             The third option is that his family help him find a

16   place in a nearby town in Oklahoma.  There's a town Van Buren

17   in Oklahoma.  There's also a town called Fort Smith which is

18   right over the border in Arkansas.  According to the Oklahoma

19   pretrial officers, they actually consider Fort Smith to be

20   part of the Oklahoma GPS area because it sort of straddles the

21   border so he could live in either of those towns.

22             There are apartments for rent.  They are many miles

23   from the family home.  And the -- and then -- and they can set

24   up a perimeter so that on GPS, he's not allowed anywhere near

25   the family residence.  So that's option three.

PROCEEDING                                    31

1          (Pause in the proceedings.)

2          THE COURT:  Sorry.  So the chicken house is the

3     white building in the middle there?

4          MR. JACOBSON:  Yes.

5          THE COURT:  Just making sure nothing got lost in the

6     game of telephone, let me hear from pretrial about any

7     thoughts you have on these proposals.

8          OFFICER CARLSON:  Yes, Your Honor.  So aside from

9     what defense counsel has already proposed as pretrial's

10    concerns which are accurate, we have a few additional concerns

11    that make this situation a bit different than the situation of

12    him living at the army base.

13         One of those issues is that the family home on the

14    property, not only would his wife and his children, along with

15    the alleged victim in this case be living there, but there are

16    also two other minor-aged children that his parents currently

17    have custody of.  So there are other minors residing very

18    close by.

19         From our understanding, from the Oklahoma office who

20    conducted that home visit, the workhouse is about 500 to

21    700 feet away from the family home.  So although it is across

22    a dirt road, it is in very close proximity to where he would

23    be residing.  The other issue, aside from the GPS issues with

24    the tin roof of the chicken house, is that -- as one might

25    understand -- Oklahoma, it is a very remote area.  And the GPS

PROCEEDING                                    32

1    signal, from what I understand from Oklahoma, is not the most

2    reliable in that area altogether because of the fact that it

3    is so remote.

4         So aside from him potentially being lost in that

5    chicken house because of the tin roof, there are other

6    potential GPS issues that, unfortunately, we have no control

7    over just due to the signal strength in the area in which he

8    would be living.

9         THE COURT:  So how do Oklahoma courts deal with it

10   with people in their jurisdiction?  Do you have any idea how

11   that affects folks who are on bond, subject to monitoring in

12   that area?

13        OFFICER CARLSON:  I'm not sure specifically.  I

14   think the issue with this particular case is the close

15   proximity.  Obviously, if this were -- you know, if option

16   three, as defense counsel had raised, if he was living

17   elsewhere in an apartment, we could put a -- you know, a GPS

18   zone around the residential home where the family resides and

19   have more assurance that he wasn't entering that home because

20   of the distance.

21        But because these residences are so on top of each

22   other, it would just be very difficult for them to pinpoint

23   exactly where he was.  Also, the other issue is that when he

24   was on the base at Fort Hamilton and the family was residing

25   there, where the family home was, the defendant really had no

1    reason to be in that area.  That part of the base was really

2    just residential homes.  So in between where he was living on

3    the barracks and where he worked and where the PDX, for

4    example, for groceries were, that was aside from where the

5    family residence was.  So although it was close, he really had

6    no reason to be over there.

7            In this circumstance, if he was working on the farm,

8    he would have a reason to be in and around that home, which is

9    another concern.  So out of all of the proposals that defense

10   counsel has brought up, we would prefer the third option of

11   him living elsewhere because of these issues.  Obviously,

12   without knowing an exact address of where he would live, we

13   can't either consent or say we don't consent.  But that sounds

14   like it would be the most preferable option at this time.

15           THE COURT:  Okay.  And am I correct, I think I would

16   have heard about it if there were, that in the time since -- I

17   believe it was maybe February or March when we were here and

18   set his bond, there had been no issues of contact with the

19   complainant by the defendant, or with any other minors that

20   have given pretrial any concern in that regard?

21           OFFICER CARLSON:  To our knowledge, that is correct,

22   Your Honor.

23           THE COURT:  Okay.  All right.

24           Ms. Schierberl, anything to add?

25           MS. SCHIERBERL:  Yes, Your Honor.  Just so the

PROCEEDING                                    34

1    record's clear, the Government does oppose the defendant's

2    proposals to move to Oklahoma.  To be clear, this is a

3    singular farm and the roads to which Counsel is referring are

4    dirt roads that are not trafficked heavily.  These are not

5    busy streets.  This is not New York.  There are a number of

6    other children in this house, not the biological children of

7    this defendant, including female children.

8           The defendant's proposal that he would work at the

9    chicken house is a problem, given our understanding that the

10   victim works in the chicken house, to earn a small bit of

11   allowance to contribute to the family.  She's also being

12   homeschooled, and this is her entire world.  She's approaching

13   15.  She rides around on a golf cart.  It seems

14   collateralitively [sic] punitive to restrict her movements

15   around her home to enable the defendant to live on a property

16   when he is alleged with being an egregious and coercive

17   hands-on offender.

18          Now we know that the GPS is unreliable within the

19   chicken house but the GPS is unreliable throughout that area.

20   This is two hours east of Tulsa.  We're talking about the

21   border between Oklahoma and Arkansas in a town known as

22   Muldrow.  Signal is not strong.  GPS cuts in and out when you

23   drive to the family home.  There were moments, in our

24   experience, where cell phone communication while driving and

25   the home cut in and out.  So it would be, as pretrial has

PROCEEDING                                    35

1    attested, inadequate to supervise this defendant if he were on

2    this property, and that's a failure, Your Honor, to adequately

3    ensure the safety of the community and specific persons.

4            Now, it may be slightly premature to address

5    proposal three which is the defendant moving to Fort Smith,

6    Arkansas.  There's no specific residence set forward.  There's

7    no specific job set forward.  The Government would certainly

8    consider a proposal by defense, but it seems somewhat

9    half-baked at present.

10           THE COURT:  Okay.  Mr. Jacobson, anything you want

11   to say in response, particularly on the comparisons between

12   the setup and the army base, both the technicalities and the

13   distance and sort of separation issues?  I am giving some

14   thought to Ms. Schierberl's point that even if inadvertent,

15   having Mr. Johnston in such close proximity to her on the same

16   property without some of the inherent separation that comes

17   with the army base could be an issue for her and so I'd like

18   to hear from you on that and anything else you want me to

19   consider.

20           MR. JACOBSON:  I think it would be a similar setup

21   at Fort Hamilton, I believe if pretrial had a sort of setup, a

22   zone around the house so that they would be alerted if

23   Mr. Johnston even tried to approach the family home.  So we

24   could set up something similar in Oklahoma.  I know obviously

25   the main difference is the signal strength.  I can't really

1    speak to that.  If the Oklahoma officer has experience with

2    losing signal, I take that as -- it is an issue.

3              But, you know, I think we're at the point where

4    Mr. Johnston has been on bail long enough that I think

5    pretrial services should trust him to do the right thing.  And

6    if there are moments that the GPS signal is lost, I don't

7    think that makes the entire plan unworkable especially if he's

8    not working in the chicken house.  If he's just living in the

9    workhouse across the road, he would know that he cannot cross

10   on to the main property.

11             And I do -- I mean, I understand what the Government

12   is saying.  And I don't disagree that we don't want to put a

13   plan in place that's going to restrict the CW's movements and

14   make the CW feel like they can't move freely on their own, in

15   their own home, especially being homeschooled, and they're

16   15 years old and need to have freedom of movement.  But I

17   think there's no reason why the complainant would need to go

18   across the road to the area where the workhouse is.  There's

19   just no reason they would need --

20             THE COURT:  You mean the chicken house?

21             MR. JACOBSON:  To the workhouse.

22             THE COURT:  Into the workhouse?

23             MR. JACOBSON:  Where Mr. Johnston would be residing.

24             THE COURT:  Oh, where the complainant would need to

25   go, I understand, yes.

PROCEEDING                                37

1          MR. JACOBSON:  This is assuming that Mr. Johnston is

2     not going to be working in the chicken house.

3          THE COURT:  Understood.

4          MR. JACOBSON:  He would be restricted to the other

5     side of the road.  And there's no reason, even in the golf

6     cart, that the complainant would have any reason to cross the

7     road.  I mean, the complainant would be on the main part of

8     the property.  And then, obviously, when they go elsewhere,

9     would just drive up the road.  And the same for Mr. Johnston,

10    he leaves the workhouse, he drives off on the road but knows

11    that he can't cross to the other side of it to the main part

12    of the property.

13         So it could be a -- in fact, I think pretrial could

14    set a much larger zone around the Oklahoma property than they

15    did at Fort Hamilton which is a much more confined space.  And

16    I think the barracks were even closer to -- be on base housing

17    at Fort Hamilton than the proposal in Oklahoma, although I

18    haven't measured.

19         MS. SCHIERBERL:  May we briefly respond, Your Honor?

20         THE COURT:  Sure.

21         MS. SCHIERBERL:  Comparing rural Oklahoma to the

22    army barracks is -- it strains credulity.  They are

23    fundamentally distinct.

24         This defendant was living surrounded by law

25    enforcement with supervisors who are aware of the charges, his

AVERY N. ARMSTRONG, RPR, NYRCR
OFFICIAL COURT REPORTER

PROCEEDING                                    38

1    family, while nearby, was living in a home with the

2    investigative CID officer at that time.  We're talking about

3    that structured military community where the defendant was

4    under constant surveillance with reliable GPS, was monitored

5    by ACS, under the Family Court order of protection, was being

6    supervised by individuals aware of the charges and while the

7    victim and her family were living in the same unit as CID, to

8    a rural farm in Oklahoma where there is unreliable

9    supervision, where pretrial services, the arm of the court

10   entrusted with supervision, has expressed its conclusion that

11   it cannot reasonably assure the safety of the community

12   because of the remoteness of the area -- the two are

13   fundamentally distinct.

14        THE COURT:  Okay.  Mr. Jacobson, anything further on

15   that point?

16        MR. JACOBSON:  No, Judge.

17        THE COURT:  Okay.  All right.  Well, I appreciate

18   that everyone has been working hard in good faith, and I want

19   to thank pretrial for getting someone in Oklahoma to go

20   inspect the property and make an assessment.

21        I'm going to deny the defense's application to have

22   Mr. Johnston live in the workhouse but work in the chicken

23   house.  I think that provides too much proximity even

24   incidental contact with the complainant.

25        But I am going to allow him -- for now, I'm going to

1   monitor and see how it goes, to live on his family property in

2   the workhouse, given that it's a three-bedroom residence and

3   it's across the road from the residence in the area where the

4   complainant is homeschooled.

5          I am mindful of the potential GPS issues.  But I

6   think to allow the lack of service or occasional gaps in

7   service in Oklahoma to keep him from his family, particularly

8   his wife and his other children, would be unnecessarily

9   punitive and given his compliance with all terms of bond thus

10  far for close to a year or at least seven, eight months, I

11  have confidence that he'll be able to honor those limits.

12         I would like to hear a report from pretrial after

13  the Oklahoma officials have assessed the perimeter and perhaps

14  the parties can work together on an agreed zone so that

15  everyone knows the ground rules as to where he can go.  But I

16  will keep him from crossing the road to the chicken house and

17  the main residence at this time.

18         And I don't think I need to impose any other

19  restrictions, but we can have pretrial work on the area that

20  he's going to be in.

21         MS. SCHIERBERL:  Your Honor, we just ask for a brief

22  stay of 48 hours.  So that we can discuss an appeal within our

23  office.

24         THE COURT:  Sure, sure.  And if there is something

25  that you want to submit to me in writing that you think I've

1    overlooked, I think again -- let me say for the record, I'm

2    mindful not only of Mr. Johnston's compliance with all terms

3    of bond on the base, but also that there were no incidents, as

4    I noted, at the prior bond hearing, and I'll incorporate all

5    of the findings I made at that hearing by reference during the

6    time between when these charges brought at ACS and those

7    proceedings were continuing even after there was a finding by

8    the family court, there was no contact at all with the

9    complainant.

10          I am also concerned about imposing an undue

11   financial burden on Mr. Johnston's wife and his family in

12   having to secure another residence in town would also make it

13   harder for him to help with childcare with his other children,

14   given that there is a place he can live at no additional

15   charge on the property and given the nature of the charges, he

16   might be without a home if he's not allowed to stay, at least

17   temporarily, on his family's property.

18          Again, I am open to proposed modifications if when

19   he arrives and gets settled in, there's any suggestion

20   whatsoever that there's improper contact, we can modify these

21   terms, revocation is always an issue, as Mr. Johnston knows,

22   and if in any way it turns out there's even inadvertent

23   contact, I may require him to get another residence in a

24   nearby town.  But for now, I don't think the showing has been

25   made that that combination of conditions is insufficient to

PROCEEDING                                                41

1   reasonably ensure the safety of the community.  And I think

2   the Bail Reform Act requires me to give Mr. Johnston the

3   opportunity to live in the conditions that he's proposed.

4            All right.  Anything else you wish to raise with me?

5            MS. SCHIERBERL:  No, Judge.

6            THE COURT:  Okay.  All right.  Thank you all.  I'll

7   see you in a couple of months.

8            Have a good one.

9            MR. JACOBSON:  I don't know, did we exclude time?

10           THE COURT:  Oh, yes.  My apologies.  All right.

11           So in light of -- I'm sorry, what was the date we

12   set for the next status, the 15th?

13           THE COURTROOM DEPUTY:  Yes.

14           THE COURT:  In light of the parties' ongoing

15   exchange of discovery, anticipated motion practice, and other

16   matters discussed on the record, I'll exclude the time in the

17   interest of justice.  All right.  Thank you all.  Until

18   November 15th.  Thank you.

19

20           (Whereupon, the matter was concluded.)

21                *    *    *    *    *

22

23   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
24
          s/ Avery N. Armstrong              September 14, 2023
25        AVERY N. ARMSTRONG                 DATE

*AVERY N. ARMSTRONG, RPR, NYRCR*
*OFFICIAL COURT REPORTER*

# Certificate of Service

This is to certify that on September 18, 2023, a copy of the foregoing petition was filed electronically using the Court's CM/ECF System.  In addition, a copy was served by first-class United States mail and electronic mail (on counsel) on the following:

The Honorable Nina R. Morrison
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Martha Pollack, Esq. PLLC
15 Metrotech, 7th Floor
Brooklyn, NY 11201
917-744-1694
Email: mpollacklaw@gmail.com

Leticia Maria Olivera
Federal Defenders of New York, Inc.
One Pierrepont Plaza - 16th Floor
Brooklyn, NY 11201
718-330-1253
Fax: 718-855-0760
Email: leticia_olivera@fd.org

Samuel Jacobson
Federal Defenders of New York
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
718-407-7429
Fax: 718-855-0760
Email: samuel_i_jacobson@fd.org

_____
MARGARET SCHIERBERL
ASSISTANT U.S. ATTORNEY